# United States Court of Appeals
## For the First Circuit

No. 17-1261

UNITED STATES OF AMERICA,

Appellee,

v.

DERRICK FAVREAU,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Jamesa J. Drake and Drake Law, LLC for appellant.
Renée M. Bunker, Assistant United States Attorney,
Appellate Chief, with whom Halsey B. Frank, United States
Attorney, was on brief, for appellee.

March 23, 2018

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, **Associate Justice**.  The defendant, Derrick Favreau, pleaded guilty to a serious drug offense, violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), but he reserved his right to appeal the district court's denial of his motion to suppress the drug evidence as having resulted from a search unlawful under the Fourth Amendment.  We affirm.

Police stopped Favreau's car for a highway offense. After police officers had completed the license check that is usual when a car is stopped for a driving offense, the drugs were found hidden in the car during a search prompted by a drug detection dog's indication of their presence.  The issues on appeal are whether, after checking the license and related matters, the police had reasonable suspicion that a drug offense was being committed, so as to justify a further period of detention while the dog repeatedly circled the car, and whether the added time so consumed (of about three minutes) exceeded the permissible duration for the dog's reconnaissance.  See Rodriguez v. United States, 135 S. Ct. 1609, 1612 (2015); United States v. Sokolow, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer

- 2 -

lacks probable cause." (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968))).

We review these legal issues de novo. See United States v. Dickerson, 514 F.3d 60, 65-66 (1st Cir. 2008). The facts about events preceding the encounter are not in dispute at this point, and in any event the district court's findings are amply supported to survive the scrutiny for clear error appropriate in reviewing the trial court's factual findings grounding the denial of a suppression motion. See United States v. Tiru-Plaza, 766 F.3d 111, 114-15 (1st Cir. 2014) ("Under this clear-error review, we grant significant deference to the district court, overturning its findings only if, after a full review of the record, we possess 'a definite and firm conviction' that a mistake was made." (quoting United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011))).

State Trooper Pappas was aware of Favreau's reputation as a drug dealer, and about a year before the confrontation in question he had received an informant's tip that Favreau possessed a vehicle that contained a "trap," a secret compartment in which drugs could be hidden and transported.[1]

---

[1] The parties dispute the reliability of the information the tipster had provided prior to this tip, and consequently the reasonableness of crediting the tip itself. But, owing to the synergy of the content of the tip and the facts that unfolded prior to and during the stop of Favreau's car, reliability ex ante is not a significant question here. The content of the tip

- 3 -

More pressing assignments kept Pappas from following up on the tip, but when his schedule allowed it, he decided to conduct surveillance on Favreau, with the help of Trooper Gagnon, as well as Trooper Rooney (who worked with a drug detection dog). Rooney drove a marked cruiser, but both Pappas and his unmarked car were well known in the vicinity where the relevant events took place.

On the day in question Pappas and Gagnon drove to where Favreau's house could be seen. They saw him get in the car the tipster had mentioned, pull away, signal a turn into a cross street, nevertheless drive straight through the intersection and, at a point where Pappas and Gagnon's police car was visible, reverse direction and then turn into the cross street in the direction opposite to his original directional signal. Rooney testified that reversing direction as Favreau had done was known as a tactic by suspects trying to elude police following them. Soon after, the troopers located the car parked in the lot of a store, which Favreau entered and left multiple times. Before driving out of the lot he looked

was significant in making sense of the other facts recited below, which themselves suggested that the tip might well be true; all, together, had a degree of coherence that raised a reasonable suspicion of wrongdoing, which in turn justified the dog sniff that provided the further fact sufficient for probable cause to search the car.

- 4 -

intently up and down each of the streets at the nearby intersection.

After the suspect had left the store lot and made another turn, this time without signaling, Rooney (following him) put on the blue lights and siren. In violation of Maine law, Favreau did not stop promptly, but turned down another street before pulling over. In the ensuing conversation about Favreau's driving violations, the status of his operating license and any current court involvement, Favreau accused the officers of mounting the very surveillance they had engaged in, thus indicating that his driving maneuvers had been made with the police consciously in mind. He was manifestly nervous and had difficulty following directions for a pat-down, which disclosed a wad of cash that Favreau said was $400. When asked where he was going his answer was that he was going home, a patent lie in light of his observed itinerary.

At this point the facts warranted reasonable suspicion that Favreau's behavior before and after the stop showed a degree of concern so far beyond anything normal as to suggest that he was in fear of revealing evidence of wrongdoing. The license check having been completed, Rooney circled the car with the dog, and although the animal was initially distracted by unrelated activity nearby, the several circuits of the car took less than three minutes before the dog alerted and thus raised

suspicion to the level of probable cause to justify the search that led to discovery of the trap and a commercial quantity of cocaine within it.

On our de novo review, we agree with the district court's mixed fact-law conclusion entirely. Although the officers' initial and primary interest in observing Favreau was his possible activity in the illegal drug trade, not the bizarre driving for which they stopped him, or his unlawful failure to respond readily to the lights and siren, their ulterior motive is of no consequence under the Fourth Amendment. See Whren v. United States, 517 U.S. 806, 813 (1996) (Supreme Court precedent "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"). Nor is there any question that Favreau's driving justified the stop for the license check and ensuing interview. The observations and conversation provided evidence of ostensibly erratic driving and behavior that would reasonably justify a stop and enquiry, but in this case pointed to something more than difficulty following the normal rules of the road: the apparent intent to evade known police cars, the unnatural scrutiny of roadways before driving from the store, the driver's accusation that the police had him under surveillance, and abnormal nervousness together with clear dishonesty about his immediate destination. The officers could

sensibly believe that he was afraid of something that concerned the police, and the tip about the trap gave coherence to his behavior and his fear. The officers could, as they did, reasonably suspect transportation of drugs or some other contraband concealed in the car. Nor, finally, is there any basis to claim that the time consumed in the initial interview and records check up to the point of ordering the dog sniff was unusual or unreasonable.

Because the interview during this initial period of detention was clearly lawful on the basis of traffic regulation and incidentally disclosed further reason to suspect drug crime, the reasonably justifiable time for further detention to test the growing suspicion should be measured from the end of that initial period. While there is no exact metric to measure it, the times that have passed muster in prior cases of justifiable detention on reasonable suspicion of criminal activity have generally been relatively brief. See Terry, 392 U.S., at 30 ("Each case of this sort will, of course, have to be decided on its own facts."); United States v. Pontoo, 666 F.3d 20, 31 (1st Cir. 2011) ("The appropriate length of a Terry stop is gauged by whether the officer diligently pursued a reasonable investigative approach . . . ."). And brief was the period here, of about three more minutes until the dog's response raised suspicion to the point of probable cause to search.

There is no serious question that this falls within the zone considered reasonable under the <u>Terry</u> rationale.  The probable cause to search was therefore not the product of any unconstitutionally lengthy detention prior to the search that could be said to taint the validity of the search itself.

<u>Affirmed</u>.