# United States Court of Appeals
## For the First Circuit

No. 17-1510

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLES FLORES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Barron, Circuit Judges.

Gail S. Strassfeld for appellant.
Benjamin M. Block, Assistant United States Attorney, with
whom Halsey B. Frank, United States Attorney, was on brief, for
appellee.

April 25, 2018

**SELYA**, **Circuit Judge**.  This appeal implicates two issues rooted in the Fourth Amendment.  See U.S. Const. amend. IV.  The first involves the district court's determination that probable cause existed for the arrest of defendant-appellant Charles Flores; the second involves the district court's invocation of the independent source doctrine and its concomitant refusal to suppress evidence seized during a warrant-backed search of the appellant's hotel room, notwithstanding the officers' earlier unlawful entry into that room.  Discerning no error, we affirm the judgment below.

## I.  BACKGROUND

When reviewing the denial of a motion to suppress, we "take the facts as the trial court found them, consistent with record support, adding uncontradicted facts where appropriate." United States v. Almonte-Báez, 857 F.3d 27, 29 (1st Cir. 2017)(internal citation omitted).

This case has its genesis in a tip received by Thomas Pappas, a Maine state trooper with thirteen years of law-enforcement experience, who was seconded to a federal Drug Enforcement Administration (DEA) task force at the times relevant hereto.  Specifically, Paul Buchanan, a fellow DEA task force member, told Pappas that he had heard from a reliable informant that a "group of New Yorkers" was peddling cocaine out of the Fairfield Inn (a hotel located in Brunswick, Maine).  Buchanan

explained that, though the informant did not have first-hand knowledge of the drug-trafficking enterprise, he had a history of providing dependable information and had "participated in a number of cases."

His interest piqued, Pappas drove to the Fairfield Inn and was joined there by another officer. He obtained a guest registry from the hotel staff and inquired whether any rooms had been paid for in cash (a practice which, Pappas testified, was commonly associated with criminal activity because it allowed perpetrators to avoid a paper trail). He learned that, of the 38 occupied rooms in the hotel, only one — room 131 — had been rented for cash. Next, Pappas explored the hotel grounds, noting that room 131 was one of the most easterly rooms; its windows faced the parking lot at the rear of the hotel; and it was near a relatively private exit.

The two officers returned to the front of the hotel, and Pappas spoke with the front-desk manager. Unprompted, she told the officers that she suspected they were there to investigate room 131. That room, she stated, had been rented by a person who listed a New York address. The room itself was occupied by a group of men and women, and one of the guests was an obese black male. Upon registration, the group had initially been assigned to a second-floor room, asked to be moved, and was transferred to room 131 (a first-floor room). According to the manager, there had

been an unusual number of visitors "coming and going on a frequent basis" to and from room 131.

With the manager's permission, the officers set up shop in a neighboring room: room 132. Around 5 p.m., Pappas observed a vehicle pull into the parking space directly adjacent to room 132. A man was driving and a second man was in the front passenger seat. An obese black male roughly matching the description previously provided by the front-desk manager[1] approached the car and got into the back seat. Pappas saw this man (later identified as the appellant) shift his weight as if reaching for something. Pappas then saw the man make an exchange with the front-seat passenger (though he could not identify what was exchanged). After the exchange, Pappas saw the appellant counting money in the back seat and then exit the car. As Pappas recalled it, the entire interaction took no more than 20 to 30 seconds. Pappas believed that he had witnessed a hand-to-hand drug transaction and that the appellant had the proceeds (and possibly additional drugs) on his person.[2]

---

[1] While testifying at the suppression hearing, the front-desk manager used the word "large," rather than the word "obese," to describe the black man whom she associated with room 131. We discern no clear error in the district court's implicit finding that, in context, these adjectives were not meaningfully dissimilar.

[2] These perceptions were later corroborated in material part by the front-seat passenger, who admitted to the authorities that he had given the appellant money in exchange for drugs.

Shortly after witnessing what he believed to be a drug buy, Pappas walked outside and saw the appellant near the exit at the eastern end of the hotel. He noticed that the appellant was smoking marijuana. After taking a lap around the hotel, Pappas inquired whether the appellant wanted the outside door held open. The appellant indicated that he had his own keycard.

Pappas went inside, asked his fellow officer to accompany him, and returned to where the appellant was loitering. After identifying themselves as law-enforcement officers, they detained the appellant and handcuffed him. Pappas testified that handcuffs were necessary to ensure officer safety, to safeguard any evidence that the appellant might have on his person, and to incapacitate the appellant should any of his confederates be nearby.

The officers proceeded to question the appellant without first giving him Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). They learned that he was from New York and was staying in room 131. A search of the appellant's person disclosed that he was carrying two cellphones, a keycard, an identification card, and cash.

The officers then brought the appellant into the hotel. As they neared room 131, they thought that they heard voices. Using the appellant's keycard, the two officers entered the room. Once inside, they were able to determine that the room was

- 5 -

unoccupied and that the voices they had heard were emanating from a television set. They performed a security sweep during which they observed, among other things, some cash and a mason jar containing marijuana. Pappas testified that, during this entry, the officers simply glanced around and did not search the room for, say, drugs, weapons, or the like.

At this juncture, the officers started to read the appellant his Miranda rights. While those rights were being recited, a woman knocked on the door of room 131 and explained that she "was sent there by some people from New York" to check on the appellant. Pappas escorted her to room 132 and interviewed her there. He asked for her cellphone, which she surrendered. Checking it, Pappas saw drug-related messages and confronted the woman about them. After she tried unsuccessfully to retrieve her cellphone, Pappas handcuffed her.

Pappas called for additional support and proceeded to complete the administration of the appellant's Miranda rights. He then asked the appellant for permission to search room 131. Failing to receive consent, Pappas waited for reinforcements to arrive so that he could then devote his time to preparing a warrant application. Meanwhile, the appellant was kept in room 131.[3]

---

[3] We question whether it is sound practice for the police to hold a suspect in a room that they believe may contain evidence of a crime (especially where, as here, there is a readily available

- 6 -

Once reinforcements arrived at the scene, Pappas began drafting an application for a search warrant. The woman who had been detained provided a statement that was included in the warrant application. Around 11 p.m., a state-court judge reviewed the application and issued a search warrant for room 131. The ensuing search revealed the presence of two bottles containing heroin, approximately 200 baggies, and a digital scale. The officers also retrieved from the appellant's person a bottle containing heroin and cocaine base (crack cocaine).

In due course, a federal grand jury sitting in the District of Maine returned an indictment charging the appellant with possessing controlled substances with intent to distribute. See 21 U.S.C. § 841(a)(1). The appellant moved to suppress the fruits of what he argued was his illegal arrest as well as all evidence obtained from his hotel room. The district court held an evidentiary hearing at which Pappas, the front-desk manager, and the front-seat passenger who had purchased drugs from the appellant in the parking lot appeared as witnesses. Following the hearing, the district court granted the motion to suppress in part and denied it in part. In its rescript, the court found that the appellant's detention outside the hotel amounted to a de facto arrest, supported by probable cause; that the appellant's pre-

alternative). This appeal, however, does not require us to probe that point more deeply.

- 7 -

Miranda statements should be suppressed; and that, even assuming that the officers' initial (warrantless) entry into room 131 was in derogation of the appellant's Fourth Amendment rights,[4] the subsequent warrant-backed search was valid under the independent source doctrine. Accordingly, the court declined to suppress the evidence seized during that search. See United States v. Flores, No. 2:16-cr-44, 2016 WL 7378104, at *8 (D. Me. Dec. 20, 2016).

The appellant entered a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving his right to appeal the partial denial of his motion to suppress. The district court accepted the appellant's conditional guilty plea and sentenced him to serve a thirty-month term of immurement. This timely appeal followed.

## II. ANALYSIS

The appellant challenges the district court's partial denial of his motion to suppress on two grounds. First, he asserts that the authorities did not have sufficient probable cause to

_____

[4] In the district court, the government claimed that this initial entry was justified by exigent circumstances. See, e.g., Almonte-Báez, 857 F.3d at 33 (explaining that exigent circumstances can justify warrantless entry into private premises if there is probable cause); United States v. Curzi, 867 F.2d 36, 41-42 (1st Cir. 1989)(same). The district court saw no need to address this claim and assumed, favorably to the appellant, that the initial entry violated the constitutional norm. Before us, the government does not renew its "exigent circumstances" argument, and we too assume that this initial entry was in derogation of the Fourth Amendment.

arrest him in the parking lot.  Second, he asserts that the warrant-backed search of room 131 was tainted by the earlier (warrantless) entry and was therefore unconstitutional.  We discuss these assertions sequentially.

Before undertaking this task, we pause to limn the applicable standard of review.  In reviewing the denial of a motion to suppress, we scrutinize the district court's factual findings for clear error and its legal conclusions (including its ultimate constitutional determinations) de novo.  See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Coombs, 857 F.3d 439, 445-46 (1st Cir. 2017).  "[W]e will uphold a denial of a suppression motion as long as 'any reasonable view of the evidence supports the decision.'"  United States v. Clark, 685 F.3d 72, 75 (1st Cir. 2012) (quoting United States v. Woodbury, 511 F.3d 93, 96-97 (1st Cir. 2007)).

## A. **The Arrest.**

The Fourth Amendment guarantees an individual's right "to be secure" in his "person[], houses, papers, and effects, against unreasonable searches and seizures."  To satisfy this imperative, an arrest — which is the quintessential seizure of a person — must be "reasonable under the circumstances."  District of Columbia v. Wesby, 138 S. Ct. 577, 585 (2018).  An arrest is reasonable if the officer "has probable cause to believe that an individual has committed . . . [a] criminal offense in his

- 9 -

presence."   Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

The appellant maintains that his detention outside the hotel constituted a de facto arrest, which was effected without probable cause and thus transgressed his Fourth Amendment rights. A "de facto arrest occurs when 'a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest.'"  United States v. Jones, 700 F.3d 615, 624 (1st Cir. 2012) (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)).  The district court found that a de facto arrest took place here, and the government does not challenge this finding on appeal. Consequently, the validity of the detention turns on whether the officers had probable cause to arrest the appellant at that time.

As we have explained, "probable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission." Morelli v. Webster, 552 F.3d 12, 21 (1st Cir. 2009).  "[P]robable cause is a fluid concept" and is "not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983).  It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  Id. at 243-44 n.13.

- 10 -

Probable cause must be assessed on the basis of the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 372 n.2 (2003). In considering "whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" Wesby, 138 S. Ct. at 586 (quoting Pringle, 540 U.S. at 371). When suspected criminality gives coherence to such historical events, a finding of probable cause is often supportable. See United States v. Favreau, 886 F.3d 27, 30 (1st Cir. 2018).

With this legal landscape in place, we consider the facts known to the officers at the time of the appellant's de facto arrest and determine whether that information, viewed objectively, gave rise to probable cause. Pappas came to the Fairfield Inn spurred by a tip — which he had reason to believe was reliable — that a group of people from New York was peddling drugs from that venue. This tip garnered some preliminary corroboration when Pappas, upon arriving at the hotel, learned that the only room paid for in cash — which Pappas expected was likely to be the case for any room associated with criminal activity — was registered to a New York address. As here, the corroboration of a tip in whole or in part through further observation is a factor that may weigh

in favor of a finding of probable cause.  See United States v. Rasberry, 882 F.3d 241, 250 (1st Cir. 2018).

The front-desk manager provided a physical description of the guests staying in the room that had been paid for in cash (room 131).  She noted that those guests received an unusual number of visitors and that they had moved to a ground-level room closer to an exit.  These facts, too, tended to corroborate the tip.

Subsequently, Pappas witnessed the appellant (an individual who roughly matched the physical description provided by the front-desk manager) take part in an interaction that appeared to be a hand-to-hand drug buy:  the interaction transpired in a vehicle in the hotel parking lot; the appellant could be seen shifting his weight in the back seat to withdraw something from his person; an exchange of some sort took place between the appellant and the front-seat passenger; and the appellant then began counting the money that he apparently had received.  The entire episode was completed in 30 seconds or less.  Shortly thereafter, Pappas saw the appellant lounging in the parking lot, smoking an illegal substance (marijuana).  When Pappas indicated that he would hold the hotel door open, the appellant waved him off, flashing a keycard and indicating that he was a guest at the hotel.

The whole is sometimes greater than the sum of the parts. The historical events leading up to the appellant's arrest were

given coherence by the tip that prompted the officers to investigate. See Favreau, 886 F.3d at 30. That tip had some indicia of reliability, and each of the officer's observations further corroborated it. Given the totality of the circumstances — especially the fact that Pappas witnessed what he reasonably believed to be a hand-to-hand drug buy — we conclude (as did the court below) that probable cause existed to arrest the appellant.

Seeking to dull the force of this analysis, the appellant argues that an anonymous tip is not inherently reliable, that the use of cash to pay for hotel rooms is not infrequent, that Pappas did not actually see drugs exchanged after the appellant entered the parked car, and that the appellant's smoking of marijuana was consistent with personal use. The inquiry here, though, is one addressed to the existence of probable cause, not one addressed to the existence of metaphysical certainty. Attempting to analyze each piece of evidence in a vacuum is inconsistent with Supreme Court case law, which makes pellucid that each item is to be considered as part of the totality of the circumstances. See Wesby, 138 S. Ct. at 586, 589 (holding that court erred when it "identified innocent explanations" for probative facts "in isolation" because such a "divide-and-conquer approach is improper"); Pringle, 540 U.S. at 372 n.2 (similar). So it is here: while any one of the facts to which the appellant adverts may be susceptible to an innocent explanation if regarded in isolation,

their cumulative effect is powerful and solidly supports a double-edged inference that a crime was being committed and that the appellant was committing it. After all, the Fourth Amendment does not require that an officer rule out potentially innocent explanations for every piece of evidence before reaching a reasonable conclusion that there is probable cause to believe that a crime has been committed and that the suspect has committed it. When it waddles like a duck, quacks like a duck, swims like a duck, and looks like a duck, it is quite likely to be a duck.

That ends this aspect of the matter. We discern no error in the district court's closely reasoned determination that the appellant's de facto arrest in the parking lot comported with the strictures of the Fourth Amendment.

## B. **The Search**.

This leaves the appellant's claim that the district court erred in applying the independent source doctrine to validate the warrant-backed search of his hotel room, thus permitting the government to use the evidence obtained as a result of that search. We commence this portion of our analysis with bedrock: a search of a dwelling must be reasonable in order to satisfy the Fourth Amendment. See Florida v. Jardines, 569 U.S. 1, 6 (2013). For this purpose, a temporary place of abode, such as an individual's hotel room, is deemed to be his dwelling. See Stoner v.

- 14 -

California, 376 U.S. 483, 490 (1964); United States v. Jones, 523 F.3d 31, 36 (1st Cir. 2008).

Subject to certain exceptions not relevant here, when "a search [of a dwelling] is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness . . . requires the obtaining of a judicial warrant." Riley v. California, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks omitted). Such a search conducted without a warrant is "presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). As a prophylaxis against unreasonable searches, we apply an exclusionary rule that "prohibits introduction into evidence of tangible materials seized during an unlawful search . . . and of testimony concerning knowledge acquired during an unlawful search." Murray v. United States, 487 U.S. 533, 536 (1988) (internal citation omitted).

In this case, we assume that the officers' initial (warrantless) entry into room 131 was in derogation of the Fourth Amendment. See supra note 4. Even so, not all evidence seized after an unlawful entry is subject to exclusion. Where, as here, a search warrant is subsequently obtained and evidence is seized or knowledge obtained as a result of the later warrant-backed search, that evidence and/or knowledge may be admissible if the warrant derives from sources independent of the earlier (unlawful) entry. See Murray, 487 U.S. at 537.

This independent source doctrine recognizes that the "interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a _worse_, position tha[n] they would have been in if no police error or misconduct had occurred." _Nix_ v. _Williams_, 467 U.S. 431, 443 (1984) (emphasis in original). Thus, when evidence or knowledge would have been gleaned even in the absence of the earlier (unlawful) entry, such evidence or knowledge should not be excluded. See _id._ Any other outcome would upset the delicate balance that the _Nix_ Court struck by "put[ting] the police in a worse position than they would have been in absent any error." _Id._

Against this backdrop, we turn to the case at hand. The district court granted the appellant's motion to suppress in part: it excluded the statements made by him after his de facto arrest and before he received full _Miranda_ warnings. The government, presumably recognizing that statements "elicited in the course of [a] custodial interrogation" are "render[ed] inadmissible" if _Miranda_ warnings are not given to the party in custody before the statements are made, _United States_ v. _Candelario-Santana_, 834 F.3d 8, 18 (1st Cir. 2016), does not challenge this ruling.[5] The

--------

[5] Of course, "the physical fruits of an otherwise voluntary statement _are_ admissible against a defendant even if a _Miranda_

- 16 -

district court also excluded any evidence obtained during the officers' initial (unlawful) entry into room 131. Withal, the court denied the motion to suppress with respect to the fruits of the warrant-backed entry into room 131. In its view, the warrant was valid under the independent source doctrine notwithstanding the earlier (unlawful) entry. We train the lens of our inquiry on this latter ruling, which is hotly contested by the parties.

The independent source doctrine obliges a reviewing court to answer two related questions: whether the officers' decision to seek a warrant was made independent of what they had learned during their earlier (unlawful) entry, and if so, whether the affidavit that they submitted to procure the warrant, when stripped of any knowledge derived from the initial entry, contained enough facts to support a finding of probable cause. See Murray, 487 U.S. at 542; United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005). The district court determined that the requirements of the independent source doctrine were satisfied, that is, it answered each of the relevant questions in the affirmative. We examine these answers one by one.

---

warning was wrongly omitted." United States v. Parker, 549 F.3d 5, 10 (1st Cir. 2008)(emphasis in original)(citing United States v. Patane, 542 U.S. 630, 641-42 (2004)). Neither the government nor the district court relied on this doctrine during the proceedings below, and we do not explore its ramifications on appeal.

We start with the officers' decision to obtain the warrant. The question of an officer's subjective intent to pursue a warrant depends on the totality of the circumstances. See Dessesaure, 429 F.3d at 369. Although "after-the-fact assurances" by an officer regarding his intent may be probative, an inquiring court is not bound by such assurances if the officer lacks credibility or if objective factors render his assurances "implausible." Id. (internal quotation marks omitted).

Here, Pappas's testimony made clear that once he detained the appellant in the parking lot, searching the appellant's room was his obvious next step. See United States v. Rivera, 825 F.3d 59, 65 (1st Cir.) (explaining that "common sense indicates that a drug pusher would want to hide . . . drug-connected things" in a place that was safe and easy to access, "like a house"), cert. denied, 137 S. Ct. 522 (2016). As Pappas told the district court, his "training and experience" led him to believe that a hotel room being used as the base for a drug-trafficking operation — such as the appellant's — was likely to contain "drugs, proceeds and weapons." Pappas further explained why, without reference to what the appellant said while under arrest, he believed that, "more likely than not," drugs were in the appellant's room. At the same time, he voiced his concern that "somebody . . . could possibly be destroying evidence." Absent consent, he planned to seek a warrant to search room 131 as

soon as he "secured" the room.  The district court supportably credited this testimony.

In any event, the court had more to go on than Pappas's bare assurances.  The record is replete with evidence that — certainly no later than the time of the appellant's arrest — the officers would have sought such a warrant, come what may.  We offer a representative sampling of this evidence.

To begin, the officers had their eye, quite literally, on room 131 from virtually the time that they first arrived at the hotel.  Among other things, the front-desk manager told them of her suspicions about room 131 and relayed that a New York address was used in renting the room; that room 131 was the only room in the hotel that had been paid for in cash; and that the occupants (after first being assigned a different room on a higher floor) asked to move and wound up in a ground-level room, near an exit.  That the officers had by then focused on room 131 is adequately evinced by the fact that they sought (and obtained) a neighboring room so that they could watch room 131.

Given the apparently reliable tip and the front-desk manager's comments about the number of visitors to room 131, Pappas had very good reason to believe that the sale he had witnessed was not an isolated incident.  Similarly, he had good reason to think that evidence of the drug enterprise was apt to be found in the appellant's hotel room.  See United States v. Barnes, 492 F.3d 33,

- 19 -

37 (1st Cir. 2007) (finding probable cause to search a residence when defendant sold drugs shortly after leaving the residence); United States v. Ribeiro, 397 F.3d 43, 49-50 (1st Cir. 2005) (same).

Struggling to parry this thrust, the appellant contends that if he had not told Pappas he was staying in room 131 and had his keycard not opened the door to that room, Pappas would not have known which room was his.[6] This contention blinks reality: it ignores a multitude of facts that corroborate the officers' belief, already formed at the time of the de facto arrest, that the drug-traffickers (including the appellant) were likely staying in room 131.

For instance, the drug transaction that Pappas witnessed took place near the hotel exit most proximate to room 131; he knew that the appellant was a guest at the hotel because the appellant had imparted that information when, prior to the de facto arrest, Pappas offered to hold the outside door so that the appellant could re-enter the premises; and the appellant roughly matched the physical description that the front-desk manager had provided

_____

[6] The appellant informed Pappas which room was his after the de facto arrest had occurred. Pappas thereafter used the keycard that he had taken from the appellant's person to open the door to room 131 without the appellant's consent. Assuming the absence of exigent circumstances, see supra note 4, that intrusion violated the appellant's Fourth Amendment rights, see United States v. Bain, 874 F.3d 1, 14-15 (1st Cir. 2017).

regarding an occupant of room 131. Indeed, the fact that the officers had placed room 131 under surveillance before any of the relevant events transpired in the parking lot is itself a strong indication that the police believed that room to be the hub of the criminal enterprise. On this record, we conclude that, after stripping the excludable evidence from Pappas's affidavit, the district court did not err — let alone clearly err — in finding that what remained demonstrated that the officers had ample reason to think that the appellant was staying in room 131. So, too, we conclude that the district court did not err — let alone clearly err — in determining that the officers' decision to obtain a search warrant for room 131 preceded both the appellant's de facto arrest and their initial (warrantless) entry into those premises.

The question persists, of course, as to whether the warrant affidavit contained sufficient facts to support probable cause even after excising the appellant's pre-Miranda statements and any knowledge gleaned during the initial (warrantless) entry into room 131. In assaying the district court's response to this question, we remain mindful that a finding of probable cause "does not require proof of guilt beyond a reasonable doubt." Almonte-Báez, 857 F.3d at 32. Such a finding requires only an objectively reasonable basis for believing "that evidence of [the crime] can likely be found at the described locus at the time of the search." United States v. Floyd, 740 F.3d 22, 32 (1st Cir. 2014) (quoting

United States v. Ricciardelli, 998 F.2d 8, 10 (1st Cir. 1993)). This "nexus between enumerated evidence of the crime and the place 'can be inferred from the type of crime', the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009) (quoting Ribeiro, 397 F.3d at 49).

We have scant difficulty in concluding that, after excising the offending facts from the affidavit, it still contained more than enough information to support a finding that evidence of drug trafficking would likely be found in room 131. See Floyd, 740 F. 3d at 32. The affidavit described the informant's tip, why that tip was thought reliable, the front-desk manager's comments, the apparent hand-to-hand drug transaction, and the facts undergirding Pappas's objectively reasonable belief that the appellant was staying in room 131. Even without the excludable evidence, what remained in the affidavit was sufficiently cogent to sustain a finding of probable cause and, thus, to justify the issuance of the warrant. Employing the independent source doctrine and undertaking de novo review of the district court's ultimate probable cause determination, see Ornelas, 517 U.S. at 699, we decry no error in the court's refusal to suppress the fruits of the warrant-backed search.

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment is

**Affirmed.**