# United States Court of Appeals
## For the First Circuit

No. 17-1362

UNITED STATES OF AMERICA,

Appellee,

v.

MARCEL HENDERSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]
[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

David A. F. Lewis on brief for appellant.
Andrew E. Lelling, United States Attorney, and Michael J.
Crowley, Assistant U.S. Attorney, on brief for appellee.

December 19, 2018

**BARRON**, <u>Circuit Judge</u>.  Marcel Henderson ("Henderson") was indicted in the United States District Court for the District of Massachusetts in April 2011 on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  He was convicted of that offense after trial in October 2016, following intermittent pre-trial proceedings, and, in February 2017, he was sentenced to time served plus three weeks of imprisonment and three years of supervised release.  Henderson now challenges his conviction and his sentence.  For the reasons that follow, we affirm.

## I.

Henderson was arrested in Boston, Massachusetts on January 2, 2011 after law enforcement found a firearm on his person pursuant to a traffic stop and pat-down frisk.  Henderson filed a motion to suppress evidence of the firearm, for which the District Court held a three-day evidentiary hearing.  Based on testimony, call transcripts, and other evidence adduced at the hearing, the District Court made the following findings of fact.

During an investigation of the Academy Homes Street Gang, law enforcement officials, including a detective with the Boston Police Department ("BPD"), intercepted a string of phone calls -- from December 30, 2010 to January 1, 2011 -- that suggested that Henderson was armed and committing violent crimes targeting members of that gang.  The intercepts also revealed that

the gang may also have been targeting Henderson, who had earlier been shot by the gang. The detective briefed other officers on the morning of January 2, 2011 about the information gleaned from the phone calls and the potential danger that Henderson posed. The detective specifically alerted team members that he expected Henderson to be armed. Officers soon thereafter "established surveillance" near Henderson's fiancée's residence in Boston, where Henderson often stayed.

That same afternoon, the detective and a special agent with the Federal Bureau of Investigation ("FBI") observed Henderson exit his fiancée's residence and engage in an "animated conversation" with another man on the public street in front of the residence. They saw Henderson reach toward his waist with his right hand, at which point the other man threw his hands up and backed away.

The detective broadcast his observations of the altercation, and his belief that Henderson possessed a firearm, by radio to a BPD police officer and a lieutenant with the Massachusetts State Police ("MSP"). They were each stationed nearby and had taken part in the detective's earlier briefing. Immediately after the altercation, the BPD officer and MSP lieutenant saw Henderson, his fiancée, and their child enter a car. The BPD officer and MSP lieutenant followed the car until it made an illegal U-turn and pulled over to the side of the road.

When Henderson exited the vehicle, the officers activated their emergency lights and pulled up behind the car.

After the MSP lieutenant informed Henderson of the traffic violation, the BPD officer conducted a pat-down frisk. The FBI special agent exited his own vehicle to assist the two officers, and the three of them pulled a firearm away from Henderson and arrested him on the scene.

## II.

Henderson challenges his conviction on two grounds. The first concerns the District Court's denial of his motion to suppress evidence of the firearm. The second concerns the District Court's grant of the government's motion to bar him from asserting a necessity defense.

## A.

Henderson argues that, contrary to the District Court's ruling denying his motion to suppress, the stop and frisk violated the Fourth Amendment to the United States Constitution. The Supreme Court has held that, under the Fourth Amendment, a law enforcement officer may conduct a brief, investigatory stop of a person, as well as a protective frisk, when the officer effecting the stop has reasonable suspicion to believe that "criminal activity may be afoot and that the persons with whom [the law enforcement officer] is dealing may be armed and presently dangerous[.]" Terry v. Ohio, 392 U.S. 1, 30 (1968). The Court

- 4 -

has further explained that reasonable suspicion entails a "level of suspicion [that] . . . is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 397 (2014) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). We review the District Court's legal conclusion that there was the requisite reasonable suspicion de novo and its factual findings and credibility assessments underlying that conclusion for clear error. See United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018).

Henderson does not dispute that, if we accept the District Court's factual findings, there was reasonable suspicion. After all, the District Court found that the law enforcement officials who conducted the stop and frisk -- and subsequently effected the arrest -- had been briefed on the contents of a wiretap that indicated that Henderson was involved in dangerous criminal activity. And, the District Court found, the officials also had knowledge of -- and direct observation of, in the FBI agent's case -- Henderson's altercation with another man, in which Henderson's actions implied that he was armed.

But, Henderson does contend that the factual findings were clearly erroneous in key respects and thus that the District Court's denial of the motion to suppress must be reversed. He does so first by making much of the fact that the District Court

- 5 -

refused to credit the testimony by law enforcement officers that they had witnessed Henderson driving the vehicle on the day of his arrest. The District Court instead credited Henderson's and his fiancée's testimony that Henderson was physically incapable of driving.

Henderson contends that, by finding that the officers were not credible in this one way, the District Court clearly erred in finding that they were credible in other key ways. And, Henderson contends, if that key testimony was not credible, then the District Court lacked any basis for concluding that the officers had the requisite reasonable suspicion to effect the stop and perform the pat down.

The District Court gave cogent reasons, however, for its decision not to credit the testimony about whether Henderson drove the car that do not in any way cast doubt on its reasons for finding the officers' testimony otherwise credible.[1] And, as we have explained before, "[t]he fact that the district court disbelieved one part of the officers' testimony but credited other parts does not render suspect the district court's credibility finding." United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005).

---

[1] Four months after the District Court's denial of his motion to suppress, Henderson filed a motion for reconsideration. The District Court denied that motion for reconsideration, but Henderson does not challenge that ruling on appeal.

- 6 -

Henderson separately challenges the District Court's factual findings on a number of specific grounds. In particular, he argues that the officers lied when they testified that Henderson was "waving his arms around before he got into the car," that there existed an affidavit that confirmed Henderson's version of events and thus undermined the account given by the officers, that the officers' vantage point would not have allowed them to observe Henderson having a conversation or getting into the car, that the officers' notes from the arrest did not reflect a belief that Henderson was armed, and that the government allegedly conceded that there was no traffic violation even though the officers had testified that there was. But, Henderson's assertions either mischaracterize the record or provide one of "two competing interpretations of the evidence, [such that] the district court's choice of one of them cannot be clearly erroneous." United States v. Cruz-Jiménez, 894 F.2d 1, 7 (1st Cir. 1990). Accordingly, we reject his challenge to the denial of his motion to suppress.

**B.**

We turn next to Henderson's challenge to the District Court's grant of the government's motion in limine to preclude him from raising a justification defense. Henderson opposed the government's motion on the ground that he had made a sufficient showing to raise a necessity defense at trial because members of

- 7 -

the Academy Homes Street Gang had threatened to kill him imminently.

The District Court granted the government's motion.  In doing so, it concluded that Henderson had failed to offer sufficient evidence "to establish that [he] was under an 'unlawful and imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury' at the time he was found in possession of a firearm on January 2, 2011."  See Dixon v. United States, 548 U.S. 1, 4 n.2 (2006); United States v. Leahy, 473 F.3d 401, 409 (1st Cir. 2007).  In reaching this conclusion, the District Court noted that "imminence" requires a real emergency giving rise to immediate danger to oneself or to a third party. See United States v. Maxwell, 254 F.3d 21, 27 (1st Cir. 2001).

Reviewing de novo, see United States v. Lebreault-Feliz, 807 F.3d 1, 4 (1st Cir. 2015), we agree with the District Court. The record simply does not support Henderson's assertion that he faced an imminent threat to his life.

**III.**

Finally, we turn to Henderson's sentence.  He contends that the District Court erred in concluding that either of his prior Massachusetts convictions, for, respectively, armed robbery and armed assault, qualified as a conviction for a "crime of violence" for purposes of U.S.S.G. § 2K2.1(a)(4)(A).  See U.S.S.G. § 2K2.1(a)(4)(A) (applying a base level offense of 20 for

"[u]nlawful receipt, possession, or transportation of firearms or ammunition," if "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of . . . a crime of violence" as defined by § 4B1.2(a), see U.S.S.G. § 2K2.1 cmt. 1).  Henderson preserved this challenge below, and thus our review is de novo.  See United States v. Benítez-Beltrán, 892 F.3d 462, 465-66 (1st Cir. 2018).[2]

The District Court did conclude that his prior Massachusetts armed robbery conviction qualified as a "crime of violence" for purposes of § 2K2.1(a)(4)(A).  And, on that basis, the District Court assigned Henderson a base offense level ("BOL") of 20.  See U.S.S.G. § 2K2.1(a)(4)(A).

The government concedes on appeal that Henderson's armed robbery conviction does not qualify as a "crime of violence" for purposes of that guideline.  The government also makes no argument that his armed assault conviction does so qualify.  Thus, the government does not dispute that the District Court committed a

---

[2] We note that, below, Henderson objected to the Probation Office's determination, in its presentence report, that he was an armed career criminal based on three prior convictions that the Probation Office classified as predicate offenses for purposes of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e).  The District Court agreed with Henderson, finding that at least one of his three convictions did not qualify as an ACCA predicate, and thus did not sentence Henderson as an armed career criminal under ACCA.  Therefore, although Henderson presses in his briefing to us that his other two convictions also did not qualify as ACCA predicates, we may bypass that question.  See United States v. Starks, 861 F.3d 306, 315 n.10 (1st Cir. 2017).

"significant procedural error" by calculating Henderson's Guidelines sentencing range ("GSR") based on the BOL of 20 that it assigned him pursuant to § 2K2.1(a)(4)(A). See Gall v. United States, 552 U.S. 38, 51 (2007) (stating that improper calculation of the Guidelines range constitutes "significant procedural error").

Nevertheless, the government argues, the District Court's GSR calculation error was harmless. In pressing this contention, the government proceeds on the understanding that, absent the District Court's application of § 2K2.1(a)(4)(A), Henderson's BOL would have been as low as 12. And, it would appear that -- assuming Henderson's criminal history category remained the same -- the lower BOL would have resulted in Henderson's GSR being less than half of the GSR that the District Court assigned to him. U.S.S.G. ch. 5, pt. A (sentencing table). Moreover, the government does not disagree that remand is often appropriate when the District Court incorrectly calculates the GSR. See Williams v. United States, 503 U.S. 193, 203 (1992).

Still, the government is right that remand is not appropriate when there are sufficient indications in the record that, "despite application of an erroneous Guidelines range," there is no "reasonable probability of a different outcome." See Molina-Martinez v. United States, 136 S. Ct. 1338, 1346 (2016). And, the government argues, that is the case here because the

- 10 -

District Court's sentencing rationale was expressly based on its concerns about permitting Henderson's immediate release from prison and thus would not have changed even if the GSR had been lower.

The government emphasizes in this regard that the District Court explained at sentencing that, because Henderson had just spent six years in prison, it was "not appropriate" for him to leave prison immediately and that instead, his sentence would provide a "structured transition."  And, the government notes, the District Court expressly found that this "structured transition" required keeping Henderson in prison for three additional weeks in order to "allow probation to find a bed for [Henderson] in a halfway house in a residential re-entry," where Henderson would then serve the first three months of his three-year supervised release period.

To be sure, the District Court never expressly stated that it would have imposed the same sentence even if the GSR were the lower one that would have applied but for the application of § 2K2.1(a)(4)(A).  Cf., e.g., United States v. Acevedo-Hernández, 898 F.3d 150, 172 (1st Cir. 2018) ("In light of this clear indication in the record that the court would have imposed the same sentence even without any of the alleged errors, we find that any errors in calculating [the defendant's] GSR would have been harmless.").  But, the District Court's clearly stated sentencing

rationale -- that the sentence of time served and supervised release of three years was necessary for Henderson's "structured transition" from prison and that the additional three weeks' imprisonment was necessary so that the Probation Office could find Henderson space at a halfway house -- could equally apply to sentencing under a lower BOL of 12. Henderson has failed to show prejudice or to rebut the government's argument that any error was harmless.

## IV.

For the foregoing reasons, Henderson's conviction and sentence are **affirmed**.