# United States Court of Appeals
## For the First Circuit

No. 21-1475

UNITED STATES,

Appellee,

v.

SEAN MULKERN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

John W. VanLonkhuyzen and Verrill Dana LLP on brief for
appellant.
Darcie N. McElwee, United States Attorney, and Noah Falk,
Assistant United States Attorney, on brief for appellee.

September 27, 2022

KAYATTA, **Circuit Judge**. This case arises from a parking-lot confrontation following a road-rage incident between the driver of a white Corvette and several men in a landscaping truck. Reports of that confrontation led law enforcement to stop Sean Mulkern in his white Corvette the next day. The subsequent searches of Mulkern's vehicle and motor home yielded evidence supporting drug-trafficking and firearms charges. Mulkern moved to suppress all of the evidence derived from what he argues were illegal searches of his person and vehicles. After the district court denied that motion in relevant part, Mulkern pleaded guilty. At sentencing, the district court found that Mulkern had three prior qualifying offenses that rendered him subject to a mandatory minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). Mulkern claims on appeal that the district court erred first in denying his suppression motion and second in finding him eligible for the ACCA sentence. As we explain below, we see no error on either score, so we affirm Mulkern's conviction and sentence.

## I.

### A.

The facts giving rise to this case unfolded over two days in May 2017. We recite those facts "in the light most favorable to the district court's ruling" denying Mulkern's motion to suppress, though we note Mulkern's "contrary view of the

testimony presented at the suppression hearing" where relevant. <u>United States</u> v. <u>Sierra-Ayala</u>, 39 F.4th 1, 6 (1st Cir. 2022) (quoting <u>United States</u> v. <u>Rodríguez-Pacheco</u>, 948 F.3d 1, 3 (1st Cir. 2020)).

**1.**

On May 24, 2017, Officers Warren Day and Jessica Ramsay of the Buxton, Maine police department responded to a dispatch call reporting a possible road-rage incident and armed confrontation. As relayed by the dispatcher, a man driving a white Corvette with red rims had reportedly pulled a gun on a man at the Timberline Country Store in Buxton. The dispatcher relayed a Maine license plate number reported for the Corvette, "2512VW," but noted that this number was actually registered to a black Lexus, rather than a white Corvette.

While en route to the Timberline, Officer Day spoke on the phone with one of the reported victims, Scott Wallingford. Wallingford, who had by that time left the Timberline and was on his way to a job site, confirmed that the driver of a white Corvette had displayed a gun and threatened him and his companions.

When Officers Day and Ramsay arrived at the Timberline, the Corvette was no longer present. The officers spoke with two store employees, who showed the officers a security video of the confrontation. According to Officer Ramsay's testimony at the suppression hearing, the video depicted a white Corvette and a

- 3 -

landscaping truck in the store's parking lot. Officer Ramsay described the Corvette as "very distinct." Three occupants of the truck got out, approached the Corvette, and argued with its driver. The driver of the Corvette then "reached into the back of the Corvette and pulled something out -- it was difficult to tell what it was at the time," and then held the object against his chest. The three men on foot then "got elevated in their behavior"; "[t]hey started yelling and pointing" before the Corvette drove off.

One of the employees, Jaaron Thurlow, had been working during the incident. He spoke with the officers after they had reviewed the video. He recounted that he had seen three men in the parking lot arguing with a fourth man in the driver's seat of a white Corvette with two red stripes running from the front to the back. Thurlow said that the Corvette driver was in his 50s and wore glasses. He reported that the men yelled at each other before the Corvette drove away and that the group of remaining men then came into the store to talk to him. As related by Thurlow, the group told him that the Corvette had sped by them on the road, that they followed him into the parking lot to confront him about his dangerous driving, and that the Corvette driver had then pulled a gun on them.

On the basis of the video and the reports from Wallingford and Thurlow, Officer Ramsay requested that her station

- 4 -

issue a "Caution Officer Safety" alert -- also referred to as a "BOLO" (short for "be on the lookout") -- in a statewide law enforcement system.  The BOLO read in full:

> *** CAUTION OFFICER SAFETY ***
> ON TODAY'S DATE BUXTON POLICE DEPARTMENT TOOK
> A REPORT OF A MALE IN A WHITE CORVETTE WITH
> RED RIMS WAS IN A ALTERCATION AT TIMBERLINE
> COUNTRY STORE 222 NARRAGANSETT TRAIL.   THE
> OPERATOR A MALE IN HIS 40'S WHITE SHIRT AND
> BALL CAP, PULLED OUT A HAND GUN AND SHOWED IT
> TO THE VICTIM.   THE VEHICLE WAS LAST SEEN
> HEADED TOWARD GORHAM.   IF LOCATED STOP AND
> IDENTIFY THE DRIVER.   THANK YOU FOR ANY
> ASSISTANCE.

**2.**

The next day, May 25, Patrol Sergeant Timothy Morrell of the nearby Westbrook, Maine police department observed a white Corvette with red rims, as described in the BOLO that he had seen come in the previous day.  He testified at the suppression hearing that, based on the distinctive nature of the vehicle, he thought, "The odds of that being someone else are pretty slim."  When the Corvette stopped and parked, Sergeant Morrell ran its license plate number -- 2513VW -- and learned that it was registered to the defendant, Sean Mulkern.  He was also able to see that the driver appeared to be a man in his 40s with a baseball cap, as described in the BOLO.

He then called Buxton PD to inform them he believed he'd located the vehicle from their notice.  Based on the vehicle description and plate number, Buxton's police chief confirmed that

the sergeant had found the vehicle Buxton PD was investigating and that his department would send officers out to speak with the driver. Sergeant Morrell acknowledged that, after the call with Buxton PD, he did not believe that he personally had sufficient information at that point to arrest Mulkern.

In the meantime, Sergeant Morrell ran a criminal background check on Mulkern and learned that he had been convicted of at least one felony and had a history of drug-trafficking charges. He also identified the driver he observed as Mulkern, based on the booking photo in the criminal history report. Sergeant Morrell then called some other local officers to assist with surveillance while waiting for Buxton PD. However, once Mulkern got back into the Corvette and began to drive away, Sergeant Morrell decided to change course and conduct a traffic stop because he did not want Mulkern to get away. As Mulkern pulled out of the driveway towards the direction of Sergeant Morrell, he saw the sergeant and then turned hard in the other direction. Sergeant Morrell then activated his lights and pulled Mulkern over.

Sergeant Morrell and another Westbrook officer, Sergeant Brian Olson, who had arrived to assist, then ordered Mulkern out of the car and frisked him. Sergeant Morrell started the frisk but soon stopped so that he could secure the scene, letting Sergeant Olson conduct the frisk instead. Sergeant Olson felt a

hypodermic needle in Mulkern's breast pocket and, when Mulkern reached for the needle and began to attempt to explain that it was his girlfriend's, the officers handcuffed him. Sergeant Olson then proceeded with the frisk and discovered a cigarette package in another pocket. The package's outer cellophane wrapper contained "white crystal rocks" that the officers believed to be crack cocaine.

At that point, according to Sergeant Morrell's testimony at the suppression hearing, the officers believed they had developed probable cause to search Mulkern's vehicle for evidence of drug trafficking. In conducting this search, they discovered a backpack containing drugs, a gun, and over $13,000 in cash. During the course of the frisk and vehicle search, Mulkern made several incriminating statements: He told the officers that the rocks in the cigarette package were his; spontaneously shouted out during the vehicle search that there was a gun in the car; and, when officers found the backpack, stated something to the effect of, "Yeah, you got it, that's it."

Later that day, evidence derived from the traffic stop and vehicle search, as well as information provided by a cooperating defendant, was used to obtain a search warrant for Mulkern's Winnebago mobile home. Law enforcement executed the warrant that evening and discovered further drugs and guns in the Winnebago.

**B.**

A grand jury indicted Mulkern on three counts of drug trafficking and firearms offenses. Mulkern moved to suppress all physical evidence and statements obtained from the stop under several theories, including that the initial stop was an unlawful seizure, that the subsequent search of his person exceeded the bounds of a lawful pat-frisk, that the evidence obtained pursuant to the ensuing search warrant for his Winnebago was tainted by the earlier infirmities as so-called "fruit of the poisonous tree," and, finally, that several of his statements during the traffic stop were the product of custodial interrogation without the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).

The district court agreed with Mulkern as to part of his Fifth Amendment Miranda claim and suppressed any statements that were prompted by the officers' questioning, while declining to suppress statements Mulkern spontaneously offered. No challenge is pressed on appeal by either party to the district court's resolution of that claim.[1]

As to the search and seizure claims, the district court denied Mulkern's motion. While the court agreed that the search

_____

[1] Mulkern does on appeal continue to seek suppression of all of his statements to law enforcement during the stop, though he does so on Fourth Amendment grounds, as the fruits of an unlawful search and seizure, rather than on Miranda grounds. We therefore consider the statements in our analysis of the Fourth Amendment challenge.

of Mulkern's person would have exceeded the lawful bounds of a pat-frisk if it could only have been justified on that basis, the court upheld all of the searches on an alternative basis: Law enforcement officers were justified in searching Mulkern's person and vehicle as a search incident to arrest because they had probable cause before the search to arrest Mulkern for being a felon in possession of a firearm.

Following the suppression ruling, Mulkern pleaded guilty to counts one and three of the indictment, for, respectively: (1) possession of cocaine base, cocaine hydrochloride, and heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C); and (2) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a).[2] He reserved the right to appeal the denial of his motion to suppress.

In its presentence investigation report, U.S. Probation recommended that Mulkern be sentenced as an armed career criminal on the basis of a 1994 Maine burglary conviction (as a "violent felony") and two 2006 Maine drug-trafficking convictions (as "serious drug offense[s]"). Mulkern disputed his eligibility for an ACCA sentence in briefing and at the sentencing hearing, but the district court ultimately agreed with Probation's

---

[2] Count Two, possession of a firearm in furtherance of a drug trafficking crime, was dismissed pursuant to an informal agreement with the government.

recommendation.[3]  The court varied downward from the sentencing range provided by the U.S. Sentencing Guidelines and sentenced Mulkern to ACCA's mandatory-minimum term of fifteen years of incarceration.

## II.

Mulkern challenges the denial of his motion to suppress and his eligibility for an ACCA mandatory-minimum sentence.  We consider these arguments in turn.

## A.

In reviewing a district court's denial of a motion to suppress, "we review legal conclusions de novo and factual findings for clear error."  United States v. Batista, 31 F.4th 820, 823 (1st Cir. 2022).  While Mulkern argued for suppression under several constitutional theories below, including that his statements were obtained in violation of the Fifth Amendment's prohibition against self-incrimination, his arguments on appeal focus exclusively on purported Fourth Amendment violations, so we train our attention accordingly.

## 1.

We begin with background principles governing our assessment of Mulkern's suppression claim.  The Fourth Amendment

---

[3] We reserve further description of the predicate offenses and the sentencing proceedings for our discussion of Mulkern's sentencing claim.

guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, a search or seizure by police does not offend the Fourth Amendment if that conduct is "reasonable." United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018). The set of constitutionally permissible seizures includes "a warrantless arrest by a law officer" when "there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). And, relatedly, the universe of constitutionally reasonable searches includes warrantless searches incident to an arrest, during which law enforcement may conduct "a full search of the person" of an arrestee. United States v. Robinson, 414 U.S. 218, 235 (1973). Where an arrest follows a traffic stop, officers may also search the arrestee's vehicle incident to the arrest "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 556 U.S. 332, 351 (2009).

The critical inquiry in many situations therefore trains on whether police possess probable cause for an arrest, which may then open the door to an incidental search. Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). "It 'requires only the kind of fair probability on which reasonable

- 11 -

and prudent [people,] not legal technicians, act.'" Rasberry, 882 F.3d at 250 (alteration in original) (quoting Kaley, 571 U.S. at 338).

Police have probable cause to arrest when, "acting upon apparently trustworthy information," they "reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." Karamanoglu v. Town of Yarmouth, 15 F.4th 82, 87 (1st Cir. 2021) (alteration in original) (quoting United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018)). For example, the "[u]ncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Id. at 87–88 (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 10 (1st Cir. 2004)). Even where a witness's account is disputed, "police officers do not have an 'unflagging duty' to complete a full investigation before making a probable cause determination." Id. at 88 (quoting Acosta, 386 F.3d at 11). Nevertheless, facts which otherwise may be sufficient to establish probable cause can be overborne by contrary material facts known to law enforcement. Cf. Jordan v. Town of Waldoboro, 943 F.3d 532, 541–43 (1st Cir. 2019) (finding that correcting a misrepresentation and two material omissions in a warrant affidavit "would have painted a fundamentally different picture" which "would fall short of establishing probable cause").

We review probable-cause determinations objectively, "asking whether the facts constitute probable cause of a crime, rather than whether the officer thought they did." United States v. Monell, 801 F.3d 34, 40 (1st Cir. 2015); see also Devenpeck, 543 U.S. at 153 ("An arresting officer's . . . subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

When determining the universe of facts that we may properly consider as the basis for probable cause, we may look to "the collective knowledge of several officers." United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021). Specifically, we "look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual arresting officer." Id. (alteration in original) (quoting United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017)).

**2.**

With these principles in mind, we now take up Mulkern's contention that the district court erred by failing to suppress evidence from the traffic stop and ensuing searches. Mulkern argues that the officers did not have probable cause to arrest him from the outset of the stop and that the search of his person revealing the rocks of crack cocaine exceeded the bounds of a lawful frisk under Terry v. Ohio, 392 U.S. 1 (1968). As a result,

he says, all evidence obtained from the traffic stop and ensuing searches, including the statements he made during the searches and interactions with law enforcement, were obtained unlawfully. Moreover, because this evidence was used to obtain the search warrant for the Winnebago, Mulkern argues that that evidence, too, must be suppressed as so-called "fruit of the poisonous tree." See, e.g., Sierra-Ayala, 39 F.4th at 16-19 (discussing this doctrine).

Mulkern's arguments hinge on his contention that the officers lacked probable cause to arrest him for being a felon in possession of a firearm at the time they initiated the traffic stop. Cf. Batista, 31 F.4th at 823 (holding that, "if there was probable cause for law enforcement to believe [the defendant] was committing a crime when he was pulled over, there was no error in denying the motion to suppress" evidence obtained from a search during the traffic stop); Rasberry, 882 F.3d at 249 (affirming the lawfulness of a search, originally conceived of as a frisk, where the totality of circumstances gave the officer probable cause to make an arrest before the search). We conclude that the police did have such probable cause and that Mulkern's claim accordingly fails.

The district court ably explained that the basis for probable cause to believe Mulkern had committed a crime rested on three factual determinations. First, based on the facts available

to the police, it would have been reasonable to believe the driver of the white Corvette on May 24 possessed a gun. Second, it would have been reasonable to conclude that Mulkern was the driver of that Corvette on May 24. Third, they could reasonably conclude that Mulkern was a felon at the time of that possession. Mulkern has conceded the third point, presumably based on Sergeant Morrell's criminal-history search revealing Mulkern's felon status, so we discuss only the first two conclusions.

As to the first, the primary source supporting the presence of a gun during the Timberline incident was Wallingford, in his reports to the 911 dispatcher and then to Officer Day in his initial telephonic interview. The Timberline store clerk, Thurlow, then also told Buxton police that Wallingford and his companions had come into the store immediately after the Corvette left and told him that they had been threatened with a gun. And while Officer Ramsay could not confirm that what she saw on the store's surveillance video was in fact a gun, she testified that she did see the driver pull something from behind him and hold it against his chest, leading the other men to display "elevated" behavior towards him.

Mulkern argues that Officer Ramsay did not definitively identify a gun from the video and that the witnesses may not have been entirely reliable for various reasons, including that Wallingford may have himself been the aggressor in the altercation

and may have been motivated to minimize his own role. But the law does not require the police to have entirely reliable information or absolute certainty when making a probable-cause determination -- only "apparently trustworthy information," Karamanoglu, 15 F.4th at 87, and a "fair probability," Rasberry, 882 F.3d at 250 (quoting Kaley, 571 U.S. at 338). Wallingford's account of a brandished gun, as relayed to Officer Day over the phone, matched what he had earlier conveyed to Thurlow and to the 911 operator in his initial call. These reports were all further corroborated by the video's confirmation that some object was indeed brandished. Objectively viewed, this information rendered reasonable a determination that the driver of the Corvette on May 24 had a gun. See Karamanoglu, 15 F.4th at 87-88.

The second factual conclusion -- that Mulkern was the Corvette's driver on May 24 -- strikes us as even more reasonable. As a threshold matter, the same car clearly was involved on both days. Wallingford and Thurlow described, and the security footage depicted, a white Corvette with distinctive features that all substantially match Mulkern's vehicle. The vehicle Sergeant Morrell saw the next day was fitted with a license plate number just one digit off of what had been recorded by the dispatcher the

prior day.[4]  Mulkern quibbles with some of the descriptions of the vehicle provided by witnesses as insufficient to associate his vehicle with the one at the Timberline, arguing that his rims are only partially red and that the stripe on his car is black, rather than the red striping reported by Thurlow.  But the officers were hardly unreasonable in concluding that it was likely the witnesses misapprehended those small details, rather than that there were two white Corvettes with red trim and virtually identical non-vanity plate numbers (and also a black Lexus with a duplicate of the plate number given on May 24).

Mulkern does not dispute that he was the driver on May 25 or that Sergeant Morrell accurately identified him before pulling him over.  That tees up the question whether Mulkern was also the driver on May 24.  Given that he was the registered owner of the white Corvette, that he was driving the car in a neighboring town the next day, and that there was no reason to think that he let another man his approximate age in a ball cap drive his Corvette on May 24, the police could reasonably conclude as part of their probable-cause determination that Mulkern was indeed the driver on both days.  Cf. Kansas v. Glover, 140 S. Ct. 1183, 1188, 1191

---

[4]  Buxton Officer Ramsay testified at the suppression hearing that, based on subsequent interviews with the victim-witnesses from the Timberline, she believed the witnesses likely reported the correct number -- 2513VW -- and that the number "g[ot] lost in translation at some point," causing dispatch to "just change[] one number of that plate" to 2512VW.

(2020) (knowledge that a person is the registered owner of a particular pickup truck, absent other information, gives rise to "an entirely reasonable inference" that the truck's driver is its owner, even if the owner's license is revoked).

To tie up a final loose end, it matters not that Sergeant Morrell did not subjectively believe that he personally had sufficient information to support probable cause to arrest Mulkern when the officers initiated the search. As we have explained, our review of probable cause determinations is an objective inquiry, unconcerned with the actual beliefs and motivations of the officers on the scene. See Monell, 801 F.3d at 40; see also United States v. Guerrero, 19 F.4th 547, 553-59 (1st Cir. 2021) (surveying Supreme Court and circuit precedent reiterating the objectivity of Fourth Amendment inquiries).

We therefore agree with the district court that the Buxton and Westbrook police departments collectively possessed sufficient information to reasonably conclude: (1) that the driver of the white Corvette at the Timberline possessed a gun; (2) that Sean Mulkern was that driver on May 24, 2017; and (3) that Mulkern was at the time a convicted felon. These conclusions provided police with probable cause to arrest Mulkern for being a felon in possession of a firearm, with the result that they could lawfully search his person incident to an arrest. That search of Mulkern's person, if incident to an arrest, would also lawfully extend to

any search of the cigarette package containing the crack cocaine. See Robinson, 414 U.S. at 235-36 ("Having in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them."). Under the facts of this case, that search incident to arrest could also permissibly include a search of his vehicle, as police could search for evidence of the crime of arrest -- namely, the gun reportedly seen in the car the day before. See Gant, 556 U.S. at 351. And, needless to say, if the evidence recovered from the traffic stop was lawfully obtained, then there was no constitutional infirmity in using that evidence to obtain the search warrant for the Winnebago. There was therefore no error in the district court's decision denying Mulkern's motion to suppress.

## B.

We turn next to Mulkern's argument that he was improperly sentenced under ACCA. As we explain further below, close review of the sentencing record compels us to find that Mulkern waived the specific argument he now raises. "[A] party waives a right when he intentionally relinquishes or abandons it." United States v. Orsini, 907 F.3d 115, 119 (1st Cir. 2018) (quoting United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002)). It follows that when a litigant "explicitly affirms a fact in the district court, that party risks waiving" his right to argue that the fact was

- 19 -

insufficiently established.  Id. (quoting United States v. Bauzó-Santiago, 867 F.3d 13, 24 (1st Cir. 2017)).  "As a general rule, a waived claim is unreviewable and, thus, cannot be revisited on appeal."  Id.

Of the three state convictions supporting the district court's ACCA finding, Mulkern challenges on appeal only the classification of his two Maine drug-trafficking convictions.  We therefore begin with some background on our treatment under ACCA of Maine's trafficking statutes, Me. Rev. Stat. Ann. tit. 17-A, §§ 1101–1103.  Those statutes classify both cocaine and heroin as "Schedule W" drugs, id. § 1102(1)(F), (I), and treat knowing or intentional trafficking in Schedule W drugs as unlawful, id. § 1103(1-A)(A).

To qualify as ACCA-predicate "serious drug offense[s]," these state-law trafficking crimes must have required proving at least "possessi[on] with intent to manufacture or distribute" the drugs.  See 18 U.S.C. § 924(e)(2)(A)(ii).  In the case of heroin and fentanyl, Maine's trafficking regime at the time of Mulkern's offenses allowed for a conviction in circumstances that do not necessarily involve such intent.[5]  See United States v. Mulkern,

---

[5]  The provisions treating heroin and fentanyl separately from other drugs for trafficking purposes (formerly found at Me. Rev. Stat. Ann. tit. 17-A, § 1101(17)(E) and (F)) were repealed in 2021, though that does not affect Mulkern's appeal.  See 2021 Me. Laws ch. 396, § 1.

- 20 -

854 F.3d 87, 95-96 (1st Cir. 2017).[6] For that reason, a conviction under that Maine law for trafficking heroin or fentanyl does not categorically qualify as a "serious drug offense" under ACCA. Id. at 97. Conversely, in the case of cocaine (and most other controlled substances), Maine's statutory regime does require the jury to find distributive intent. See United States v. Mohamed, 920 F.3d 94, 104 (1st Cir. 2019). Hence, a conviction under Maine law for trafficking cocaine categorically qualifies as a serious drug offense under ACCA. Id.

The record is clear that both parties and the court were well familiar with the foregoing differential treatment under ACCA between a conviction under Maine law for trafficking heroin/fentanyl and, as most relevant here, a conviction for trafficking cocaine. So, if defense counsel thought that the government could not prove by proper evidence that the prior convictions were for trafficking in cocaine, the apt argument was readily apparent: Such a failure would have required the court to assume that the convictions did not involve an intent to distribute and thus could not support an ACCA sentence.

Instead of pursuing the cocaine/heroin dichotomy, the defendant's sentencing memorandum started with the premise that both of his Maine trafficking convictions "primarily involve

---

[6] The 2017 Mulkern case is unrelated to this proceeding, despite the common surname.

cocaine." He specifically identified as the "pertinent trafficking statute" the one that "deal[s] with the 14 grams or more of cocaine." That statute allows for a "permissible inference" of intent to distribute based on the quantity of cocaine possessed, Me. Rev. Stat. Ann. tit. 17-A, § 1103(3)(B), a mechanism which we held in Mohamed does not equate to taking the question of intent away from the jury, contrary to the Maine regime for heroin at the time. See 920 F.3d at 104-05; see also Francis v. Franklin, 471 U.S. 307, 314 (1985) ("A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved."). Mulkern then argued that his conviction under that statute did not qualify as an ACCA offense because, in his view, "[a]ll that is required [under that statute], is that the possessor possessed the requisite amount of cocaine, and nothing in the available documents shows the Defendant in this case pled guilty to intending to manufacture or distribute cocaine either." In short, he first conceded that he was convicted of trafficking cocaine, and he contended only that our decision in Mohamed construing that offense as requiring a finding of distributive intent was wrong.

Defense counsel at sentencing continued to argue for narrowing or rejecting Mohamed's holding that trafficking in

cocaine under Maine law was an ACCA-qualifying serious drug offense. Counsel noted that the district courts in Mohamed and Mulkern, even with the benefit of so-called "Shepard proceedings,"[7] ruled against the government. In the course of that argument, counsel stated that the particular Shepard documents filed at that point in this case by the government "don't really give us much information at all, other than confirming that Mr. Mulkern was convicted of a drug trafficking offense under [Maine law]." Alert, if not paranoid, government counsel promptly sought clarification.

> [GOVERNMENT COUNSEL]: . . . [B]ased upon the
> -- the sentencing memorandum filed by the
> defendant and the arguments presented in those
> filings, it was the Government's understanding
> that there's no dispute that the prior
> convictions involved cocaine, and so I wanted
> to confirm that that is not a disputed issue
> before I not offer any more exhibits.
>
> THE COURT: [Defense Counsel], is there any
> dispute on that question?
>
> [DEFENSE COUNSEL]: No, Your Honor.
>
> THE COURT: All right. So that is established,
> that they did involve cocaine.

The government then went on to explain why it sought this clarification, emphasizing that "it makes a difference what drug we're dealing with" and that "[t]he drug matters," for the

---

[7] Shepard v. United States, 544 U.S. 13, 26 (2005), established that a court considering an ACCA sentence may consult certain limited documents relating to a divisible prior offense to determine whether the defendant was convicted of a form of that offense that qualifies as an ACCA predicate.

reasons outlined above. In the course of this explanation, the government explicitly relied on its perfectly reasonable understanding of Mulkern's concession, that the disputed offenses "did involve cocaine" and "didn't involve heroin or fentanyl."

The court summarized the government's argument as essentially saying that "because the crime was cocaine, intent had to be proven," before inviting defense counsel to respond to that summary. In doing so, defense counsel did not once mention heroin or fentanyl, or in any way suggest that either prior conviction was or could have been for trafficking heroin or fentanyl. Instead, he argued that Mohamed was wrong to hold that cocaine trafficking under Maine law qualified as an ACCA serious drug offense and urged the court to adopt the dissenting position in that case.

Having heard the foregoing, the district court noted that it had to follow Mohamed since "this case involves cocaine, a different drug" than the heroin involved in our 2017 Mulkern decision. The court then asked defense counsel "is there any aspect of these legal issues I have not addressed that needs to be addressed?" "No," replied defense counsel.

On appeal, Mulkern now points out that the Shepard documents that the government did file in reliance on his concessions do not -- at least for one offense -- make clear

whether the conviction was for trafficking cocaine or heroin. As to his apparent waiver of this argument, he advances two theories.

First, he contends that defense counsel did argue in the district court that the Shepard documents (introduced by the government) were insufficient to determine under which prong of Maine's drug trafficking statute Mulkern was convicted. But setting aside whether this form of the argument was ever actually sufficiently articulated, the mere suggestion that defense counsel may have been raising this very argument prompted the government's request for clarification as to whether Mulkern was back-tracking on his concession in his sentencing memorandum that the "pertinent trafficking statute" was the one that "deal[s] with the 14 grams or more of cocaine." If so, the government reserved the right to offer additional Shepard documents. Quite plainly, defense counsel then assured the government and the court that the convictions involved cocaine. Hence, no additional documents were offered.

Were there any doubt about the scope of the stipulation, the government and the court made patently clear that they understood the defendant to be conceding that "both of these convictions involve cocaine, trafficking cocaine, not trafficking

heroin or fentanyl." That natural reading of the concession, understandably, prompted no protest from Mulkern's counsel.

Picking at bits and pieces of what was said in the district court, Mulkern quotes a partial sentence from his sentencing memorandum stating, "[N]othing in the available documents shows the Defendant in this case pled guilty to intending to manufacture or distribute cocaine either." He contends that this shows his argument below was broader than what we have described. But as we noted above, the full quoted sentence reads: "All that is required, is that the possessor possessed the requisite amount of cocaine, and nothing in the available documents shows the Defendant in this case pled guilty to intending to manufacture or distribute cocaine either." In other words, counsel was arguing that there was no support for a finding of intent to distribute the cocaine, not that cocaine was not the object of the charge.

Mulkern next argues that although both convictions "involved" cocaine, one also may have in fact involved some heroin. Therefore, he reasons, the admission that the case involved cocaine did not necessarily mean that the actual charge on which he was convicted was for trafficking cocaine. This argument, too, fails in context. As we have explained, it is clear from the full backdrop of the district court's question to counsel that the court was not concerned with the nature of the conduct in fact, but

rather the nature of the offense charged.  In that context, defense counsel at sentencing unequivocally assured the court that Mulkern had been convicted of trafficking cocaine, and he then acquiesced in repeated characterizations that the convictions did not involve heroin or fentanyl.

Citing United States v. Kennedy, Mulkern next points out that "trial testimony" cannot fill a hole in the Shepard documents, so his lawyer's admission of the "brute facts" of his prior offense should not either.  See 881 F.3d 14, 23 (1st Cir. 2018).  But Kennedy refers to testimony given in connection with the adjudication of the prior conviction, not a concession later made concerning the nature of that prior conviction.

Considered within the context of the arguments in the sentencing memorandum and at the hearing, the only plausible conclusion is that Mulkern "explicitly affirm[ed] . . . in the district court" that his prior convictions were for trafficking in cocaine, the very fact whose finding he now questions.  Orsini, 907 F.3d at 119.  He has therefore "intentionally relinquishe[d] [and] abandon[ed]" this argument, so we need not consider it on the merits.  Id.

To be sure, there are circumstances -- "hen's-teeth rare" -- where we may in our discretion excuse a recognized waiver.

Id. at 120.  Mulkern suggests in a footnote of his reply brief that this is such a case.  We disagree.

Excusing waiver may be appropriate where "the equities heavily preponderate in favor of such a step."  Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995).  We also consider "whether the failure to advance an argument was deliberate or inadvertent."  Sindi v. El-Moslimany, 896 F.3d 1, 28 (1st Cir. 2018).

In this instance, Mulkern gives us no reason to think that the waiver was the product any misunderstanding or error of law.  Mulkern and his counsel very likely knew or could have determined whether his prior offenses were not for trafficking cocaine.  Nor was the waiver a slip of the tongue -- it was written in the sentencing memorandum and then repeated and confirmed in response to direct inquiry by the district court.  Indeed, the argument that Mulkern made below proceeded from the very premise he now contests.

Notably, Mulkern even now does not assert that his prior conviction was not on account of his cocaine dealing.  His argument, instead, is that there is insufficient documentation to prove that fact but for his concession.  So this is not a case in which a waiver might have led the court to sentence under ACCA a defendant who was not in fact within its scope.  In short, he is in fact precisely the person that Congress wanted to receive an

ACCA sentence, and his waiver waives no contention that he is not that person. Rather, it waives only the Sixth Amendment hurdle that might have allowed him to avoid that classification.

Our dissenting colleague misapprehends both our holding and what happened in the district court. Neither we nor the district court have relied on any stipulation of law. Nor did the district court rely on just the Shepard documents before it. Rather, the district court relied on Mulkern's agreement with the prosecution concerning a key fact: that the pertinent prior convictions under Maine's drug distribution laws "did involve cocaine" and "didn't involve heroin or fentanyl." The entire discussion in the district court was premised precisely on the understanding that that fact was pivotal if Mulkern could not convince the court that it should reject this circuit's holding in Mohamed.

Nor is there any reason that the district court need have sought more Shepard documents given Mulkern's agreement that his conviction was for selling cocaine. F.R. Evid. 801(d)(2); cf. United States v. Serrano-Mercado, 784 F.3d 838, 847 (1st Cir. 2015) (no error for district court to rely on "unchallenged characterization" of a purported ACCA predicate); United States v. Rios-Hernandez, 645 F.3d 456, 463 (1st Cir. 2011) (no clear and obvious error for district court to rely on defendant's "apparent acquiescence to the characterization of the prior convictions").

Were that not so, much of criminal practice in our district courts would have to be revamped. Nor was this, as the dissent argues, a stipulation of law; it was a stipulation of fact: that he had been convicted under Maine law of dealing cocaine.

Even were we to excuse that waiver, we would still leave Mulkern facing the burden of plain error review, which Mulkern fails even to address in his main brief on appeal. See United States v. Rodriguez-Monserrate, 22 F.4th 35, 40 (1st Cir. 2021) (holding that an argument "at best entitled to plain error review" was waived where the appellant "ma[de] no attempt to satisfy that standard" in his opening brief).

Excusing that waiver as well, the dissent fashions a bespoke version of plain error review that fails to account successfully for our plain error cases. In those cases, counsel did not go so far as to affirmatively tell the judge that something is so. Rather, counsel only remained silent when something was said to be so. Even in that setting, though, we repeatedly placed the burden on the appellant to at least represent that the missing documents would support the forfeited position raised on appeal. See Serrano-Mercado, 784 F.3d at 848; United States v. Davis, 676 F.3d 3, 10 (1st Cir. 2012); United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006). Here, where counsel was not merely silent, but actually assured the court that the prior conviction involved cocaine, it should follow a fortiori that the

- 30 -

defendant must at least do what we required in our other cases, assuming that defendant was entitled to plain error review.

The dissent tries to explain its more favorable treatment of Mulkern by pointing out that in his waiver he did not expressly say that there were Shepard documents confirming that the prior conviction was for trafficking cocaine. This strikes us as an immaterial distinction given that his more categorical waiver -- in context -- subsumed the underlying facts concerning the state records. The prosecution's contention was that his conviction was for dealing cocaine. He challenged that contention only by saying that even cocaine convictions did not qualify because Mohamed was wrong. And when asked, he said -- clearly, in context -- that he was not challenging that it was a conviction for dealing cocaine. So we do not think that we can say that all he did was neglect to argue that the Shepard documents put in so far were themselves not sufficient.

The observation that Mulkern did challenge ACCA applicability also strikes us as beside the point. His challenge was not that his prior conviction may have been for trafficking heroin. In context he clearly was agreeing that there was no need for the government to do more to show that he had been convicted of trafficking cocaine. What he argued, instead, was the entirely separate point that Mohamed was wrongly decided. And that is an argument that he would have made even if the record contained a

court document unequivocally attesting to his conviction for trafficking cocaine.

Finally, our dissenting colleague faults the government for not arguing each prong of the plain error test. But this, too, overlooks the well-settled assignment of burdens, which do not impose on the government the obligation to argue against each prong of a test that the defendant did not even mention in his opening brief and which would only be available to the defendant were we to forgive his waiver. See United States v. Rodríguez-Torres, 939 F.3d 16, 40 & n.14 (1st Cir. 2019) (reiterating that the party asserting plain error carries the burden of establishing its elements and that efforts to do so for the first time in a reply brief "come[] too late" and are waived).

## III.

For the foregoing reasons, the decisions of the district court are affirmed.


  **- Opinion Concurring in Part and Dissenting in Part Follows -**

**BARRON, Chief Judge, concurring in part and dissenting in part**. The sentence that Thomas Mulkern received under the Armed Career Criminal Act ("ACCA") is both mandatory and long. It is also plainly not supported by the sole evidence that the District Court relied on to impose it -- namely, the only official documents from Mulkern's state-court criminal proceedings that the District Court "received" during the federal sentencing proceedings. For that reason, it is not a sentence that has been lawfully imposed.

The majority concludes otherwise based on what it describes as Mulkern's stipulation of fact to the District Court. But, as I will explain, the stipulation that the majority has in mind was one of law, rather than fact. Accordingly, I cannot agree that any stipulation that Mulkern may be deemed to have made below bars us from considering his legal argument for overturning his sentence due to a lack of supporting evidence for it. And, because that legal argument is plainly correct, I would vacate his sentence, although I agree with the majority that his conviction must be affirmed.

## I.

Mulkern's sentencing challenge on appeal focuses on what he contends is the evident inability, as a matter of law, of the so-called Shepard documents on which the District Court relied to provide the evidentiary basis for the mandatory, 15-year prison term that is at issue. Shepard v. United States, 544 U.S. 13, 26

(2005) ("We hold that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information."). Those documents consist of the official records from the state criminal proceedings in which Mulkern was convicted of two drug "trafficking" crimes under Maine law.

The government submitted the Shepard documents at Mulkern's federal sentencing proceedings to establish that he had been convicted of three ACCA-qualifying convictions at the time of his firearms possession, thereby requiring the imposition of the ACCA's mandatory fifteen-year prison sentence. 18 U.S.C. § 924(e)(1). The government contended based on those specific documents that Mulkern had been convicted not only of a "violent felony" within the meaning of the ACCA, due to a prior Maine-law burglary conviction that he had received, but also of two "serious drug offense[s]" within the meaning of that same statute, due to the two Maine-law drug "trafficking" convictions that he had received as well. Id.

Mulkern does not dispute on appeal that he was convicted of a "violent felony" within the meaning of the ACCA based on his

burglary conviction. But, he argues that, as a matter of law, the Shepard documents regarding the two drug "trafficking" convictions that the government submitted fail to show that he had been convicted of two "serious drug offense[s]." Those documents, he contends, show at most that he had been convicted of one "serious drug offense," leaving him with only two (rather than the required three) convictions that qualify as predicate convictions under the ACCA.

Mulkern points out that the relevant Shepard documents consist solely of his two judgments of conviction for violating Maine's drug "trafficking" statute. See Me. Rev. Stat. Ann. tit. 17-A, § 1103(1-A)(A). He then observes that, at the time of those convictions, that Maine statute set forth a divisible drug "trafficking" offense, as that statute set forth two separate drug "trafficking" crimes -- one cocaine-based and one heroin-based. See United States v. Mohamed, 920 F.3d 94, 104-105 (1st Cir. 2019).

Mulkern contends that this feature of the Maine statute is significant because we have held that only one of those two state-law "trafficking" crimes qualifies as a "serious drug offense" under the ACCA. 18 U.S.C. § 924(e)(2)(A)(ii). Specifically, he rightly notes that we have held that the one for "trafficking" cocaine does qualify, see Mohamed, 920 F.3d at 104-105, while the one for "trafficking" heroin does not, see United States v. Mulkern, 854 F.3d 87, 96-97 (1st Cir. 2017).

Thus, Mulkern contends that the Shepard documents that the government submitted -- namely, the two judgments of conviction for his Maine drug "trafficking" crimes -- in and of themselves can suffice to show, legally, that he had been convicted of two "serious drug offense[s]" only if each judgment of conviction specifies on its face that it is for the ACCA-qualifying, cocaine-based "trafficking" offense. For, only then could those documents, by themselves, show that neither of his drug "trafficking" convictions is for the non-ACCA-qualifying, heroin-based "trafficking" offense. Mathis v. United States, 579 U.S. 500, 519 (2016) ("Of course, such record materials will not in every case speak plainly, and if they do not, a sentencing judge will not be able to satisfy '[the] demand for certainty' when determining whether a defendant was convicted of a generic offense." (quoting Shepard, 544 U.S. at 21)). And, Mulkern goes on to argue, one of those two judgments of conviction fails to provide the necessary indication that it was for the cocaine-based "trafficking" crime.

Mulkern does acknowledge that the record before us also contains a description of the conduct in which he was engaged when he committed the Maine "trafficking" offenses for which he was convicted. That description is set forth in the Pre-Sentence Report ("PSR") that the U.S. Office of Probation prepared in advance of Mulkern's federal sentencing. Mulkern further acknowledges that he did not object to that description of his

criminal conduct in his federal sentencing proceedings, and he does not dispute the accuracy of that description on appeal.

But, Mulkern points out that the description of his past conduct in the PSR shows only that, as to one of the two "trafficking" convictions, he was engaged in "[t]rafficking in [s]cheduled [d]rugs" and that, per the PSR, the conduct underlying that offense involved both cocaine and heroin. Thus, he contends that, based on that description of his underlying criminal conduct, he could have been charged under Maine law either with "trafficking" cocaine or "trafficking" heroin. Mulkern therefore contends that, even when the PSR's undisputed description of his criminal conduct is combined with the relevant judgment of conviction for drug "trafficking" that is in the record, nothing shows that that Maine drug "trafficking" conviction is for the ACCA-qualifying, cocaine-based "trafficking" offense.

In consequence, Mulkern contends that, as a matter of law, the record fails to establish that he is subject to the mandatory fifteen-year sentence that the ACCA requires, because there is simply no document in the record that, as a matter of law, could establish that he had three ACCA-qualifying convictions -- rather than, at most, two, based on his prior burglary conviction and his conviction for one cocaine-based "trafficking" offense -- at the time of his firearms possession. Thus, he contends, the record does not permit the ACCA's mandatory,

15-year prison sentence to be imposed on him until the government augments that record with additional documents from Mulkern's state court criminal proceedings that the District Court has not yet seen.

## II.

Of course, as the government asserts, and the majority concludes, Mulkern did not make this potentially winning argument below. He argued at his federal sentencing proceedings only that he could not be subjected to the ACCA's mandatory, fifteen-year prison sentence even if the record sufficed to show that he had been convicted twice for the cocaine-based variant of the state-law "trafficking" offense. That was because, he contended in the District Court, we were wrong, as a matter of law, to have held in Mohamed that such a cocaine-based "trafficking" crime under Maine law is itself a "serious drug offense" under the ACCA, 920 F.3d at 104-105, given the reasons that we gave in an earlier case for holding that the heroin-based variant of that "trafficking" offense is not, Mulkern, 854 F.3d at 96-97.

I happen to agree with Mulkern that Mohamed was wrongly decided. See Mohamed, 920 F.3d at 107 (Barron, J., dissenting). But, this panel, like the District Court, has no power to disregard a controlling precedent of this Circuit. Thus, we have no choice but to reject the legal argument that Mulkern made below based on Mohamed, just as the District Court had no choice but to do so.

- 38 -

The key question for us on appeal therefore reduces to this: does Mulkern's failure to make a potentially winning argument to the District Court about the legal deficiency of the record on which the District Court relied in imposing his sentence bar him from making that same argument to us on appeal? The majority concludes that it does, given the way that it understands Mulkern to have presented his case below. It emphasizes in this regard that Mulkern's counsel agreed when questioned by the District Court that -- based on what the Shepard documents that had been given to the District Court showed -- the drug "trafficking" convictions at issue were for the cocaine-based rather than the heroin-based variant of the drug "trafficking" crime.

That said, it is not always easy to distinguish the knowing abandonment of an argument (waiver) from the failure to make one (forfeiture). See United States v. Antonakopoulos, 399 F.3d 68, 76 n.7 (1st Cir. 2005); United States v. Campbell, 26 F.4th 860, 871 (11th Cir. 2022) (en banc). And, I am not as confident as the majority that Mulkern's defense counsel was knowingly giving up a seemingly strong argument in pressing the alternative one that he wrongly thought was even better.

Nonetheless, the majority recognizes that a waiver may be excused in rare cases. United States v. Orsini, 907 F.3d 115, 120-21 (1st Cir. 2018) (explaining that a defendant's waiver can be excused when the "equities heavily preponderate in favor of

- 39 -

such a step," and that "[i]n deciding whether an exception is warranted, we may consider factors 'such as whether the inadequately preserved arguments are purely legal, are amenable to resolution without additional factfinding, are susceptible to resolution without causing undue prejudice, are highly convincing, are capable of repetition, and implicate matters of significant public concern'" (quoting Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995) then Sindi v. El-Moslimany, 896 F.3d 1, 28 (1st Cir. 2018))). And so, in what follows, I assume that the majority is right to conclude that we are dealing with a waiver rather than a forfeiture, because I see no reason not to excuse the waiver insofar as there was one.

I must emphasize, though, that my disagreement with the majority is about more than the circumstances in which a waiver may be excused. It also concerns how to understand what transpired below.

The majority does not appear to be of the view that Mulkern waived the legal argument that he now makes to us merely because he took the opposite legal position below. The majority instead appears to be of the view that Mulkern waived that legal argument by stipulating to the District Court (even if only implicitly) that, as a matter of fact, there were Shepard documents in existence that, unlike the ones that the government submitted in the federal sentencing proceedings, would suffice, as a matter

of law, to show that Mulkern was twice convicted of the cocaine-based, rather than the heroin-based, variant of the drug "trafficking" crime under Maine law.

But, as I will explain, I cannot agree that Mulkern made any such factual stipulation. As a result, I cannot see how the representations that he made below preclude him from successfully arguing to us that, as a matter of law, at least one of his prior drug "trafficking" convictions was not for what the ACCA deems to be a "serious drug offense."

**A.**

The majority does not dispute that the waiver of an argument about a "purely legal question," as opposed to the waiver of a contention about a question of fact, may be excused. Sindi, 896 F.3d at 28. And, in my view, Mulkern did waive only an argument about a purely legal question.

The only evidence that the District Court identified as providing support for its determination that the ACCA sentencing enhancement applied to Mulkern consisted of the Shepard documents described above -- namely, Mulkern's two judgments of conviction for drug "trafficking" under Maine law. Indeed, the District Court was quite clear during Mulkern's sentencing hearing that it was only the Shepard documents that it had "received" that provided the evidentiary basis for the determination that Mulkern had the requisite number of qualifying convictions under the ACCA.

- 41 -

Thus, we need not engage in any fact-finding to determine whether there is merit to Mulkern's supposedly waived argument regarding the insufficiency of the evidentiary basis for the imposition of the ACCA's mandatory 15-year prison sentence. We need only apply the law to the undisputed facts by examining those precise Shepard documents in the record on which the District Court relied and determining whether, as a matter of law, they show what they must under Mathis. See Mathis, 579 U.S. at 519.

**B.**

Mulkern's purely legal contention is also "highly convincing." Orsini, 907 F.3d at 120-21. As I have explained, the only Shepard documents that pertained to drug offenses that the District Court "received" show no more than that each of Mulkern's state-law drug "trafficking" convictions was for an offense that was set forth in a statute that set forth two separate crimes, only one of which qualifies under the ACCA as a "serious drug offense." Moreover, the unobjected-to PSR does not describe the conduct by Mulkern that underlies one of these two convictions in a manner that could show what the relevant judgment of conviction itself plainly does not -- that it was for the cocaine-based "trafficking" crime rather than for the heroin-based one.

So, under Mathis, the record plainly is not sufficient, as a matter of law, to show that Mulkern did have three prior ACCA-qualifying convictions. Instead, the record at most shows that he

had only two such convictions -- the one for a "violent felony" based on his conviction for burglary and the other for a "serious drug offense," based on a drug "trafficking" conviction under Maine law for "trafficking" cocaine. Indeed, I cannot see what possible argument there could be to the contrary, given that there is no dispute that a conviction for "trafficking" heroin under Maine law is not a "serious drug offense" under the ACCA.

I do recognize that in other cases we have held that defendants could not show plain error in arguing for the first time on appeal against the application of federal sentencing enhancements based on their contentions that the government had failed to submit adequate Shepard documents at their federal sentencing proceedings. See United States v. Serrano-Mercado, 784 F.3d 838 (1st Cir. 2015); United States v. Davis, 676 F.3d 3 (1st Cir. 2012); United States v. Turbides-Leonardo, 468 F.3d 34 (1st Cir. 2006). But, those cases are not like this one.

The defendants in those cases had acquiesced, through their silence at their federal sentencing proceedings, to the characterization of the offenses underlying their prior convictions that had been set forth in the PSRs. On appeal, those defendants did correctly point out that there were no Shepard documents in the record sufficient to support the relevant enhancements to their sentences. Nonetheless, we interpreted their silence at sentencing to indicate that some Shepard documents

existed that, although not in the record before the sentencing courts, would support the enhancements in question.  We thus declined to presume on appeal in those cases that, as matter of fact, those extra-record Shepard documents -- if revealed -- would show something other than what the defendants seemed to accept that those documents would show through their failure to challenge the PSR's characterization of the nature of the offenses underlying their prior convictions.  After all, there was good reason (based on the defendants' silence in the face of the PSR) to think the defendants were stipulating, as a matter of fact, that Shepard documents that would provide the evidentiary basis for their sentence could be produced.  See Serrano-Mercado, 784 F.3d at 848 (noting that there, like Davis, the defendant had not objected to either the PSR's or the sentencing judge's characterization of the offense, and as a result, "[t]he District Court thus had no Shepard documents before it -- nor any request that it obtain and review such documents -- that might cast doubt on either the pre-sentence report's assertion that the enhancement applied or on the defendant's apparent agreement with that assertion").

Here, however, Mulkern did not at any point suggest in the proceedings below -- through a failure to object to the PSR's characterization of the statutory offense of conviction -- that there was in fact some document from his state court proceedings that had not been entered into the record but that when produced

would reveal what the documents from those state proceedings that were in the record did not. As we have seen, the PSR did not even characterize one of Mulkern's two, prior "trafficking" convictions as being for "trafficking" cocaine. The PSR stated in the relevant respect only that Mulkern had been convicted of "trafficking" a "controlled substance" and that that conviction qualified as an ACCA predicate.

Moreover, the PSR also did not describe Mulkern's conduct in committing one of the state-law drug "trafficking" crimes of which he was convicted in a way that would require us to conclude that the conviction based on that conduct must have been for the cocaine-based variant of the Maine "trafficking" offense. As Mulkern convincingly explains, the description of his conduct in the PSR refers to his having been in possession of both heroin and cocaine. In other words, he seemingly could have been charged based on that conduct with either the cocaine- or heroin-based variant of Maine's drug "trafficking" offense. Thus, while Mulkern did not dispute that description during the sentencing hearing below, his failure was not a stipulation to the factual nature of his conduct that would compel the conclusion that he was convicted for that conduct of "trafficking" cocaine rather than heroin.

Notably, my understanding of what transpired below is not just my own. The government does not itself contend (as the majority necessarily does in relying on the claimed stipulation)

that Mulkern, at any point, suggested through either what he did say or what he did not that there were any damning, extra-record Shepard documents out there that had not been submitted to the District Court. And, indeed, the District Court also appears to have understood Mulkern's position at sentencing to have been merely that, because Mohamed was wrongly decided, the specific Shepard documents that had been entered into the record as to at least one his two drug "trafficking" convictions did not suffice, as a matter of law, to establish that he had been convicted of a qualifying offense under the ACCA even if the conviction was for "trafficking" cocaine.

Thus, the District Court did not suggest that there was any factual stipulation by Mulkern to there being extra-record Shepard documents that would supply the evidentiary support for a 15-year mandatory prison sentence under the ACCA. The District Court concluded only that the Shepard documents that it had "received" supplied that evidentiary basis, given that Mohamed was a controlling precedent.

So, to the extent that the District Court was misled by Mulkern due to the argument that he made below about what the Shepard documents in question sufficed to show about the type of "trafficking" crime of which he had been convicted, the District Court was misled solely about a point of law, not a matter of fact. For, in crediting the notion that the Shepard documents that it

- 46 -

had "received" in and of themselves sufficed to show that Mulkern had been convicted twice of "trafficking" cocaine -- and thus that those documents in and of themselves sufficed to show that Mulkern was subject to the ACCA's fifteen-year, mandatory minimum prison sentence -- the District Court was necessarily making a legal rather than a factual judgment about what those documents demonstrated.

In other words, I do not take issue with the majority's suggestion that a defendant (by implication) may be deemed to have stipulated to a fact and thereby to have obviated the need for the government to put forth evidence to prove that fact. I merely conclude that we have no such stipulation of fact here.

Mulkern did stipulate that the specific Shepard documents that the government submitted to the District Court -- namely, the two judgments of conviction for drug "trafficking" -- showed that he had two prior convictions for "trafficking" cocaine. But, Mulkern did not thereby make the factual stipulation that he had been twice convicted of "trafficking" cocaine that the majority attributes to him. Instead, the record shows that, by agreeing that the Shepard documents before the court sufficed under Mathis to show that he had been twice convicted of "trafficking" cocaine, Mulkern was making only a stipulation of law concerning the legal sufficiency of those documents to reveal that the underlying offense was cocaine-based. But, as I have explained, in light of

Mathis, that legal stipulation was plainly wrong, given the divisible nature of the statute setting forth that offense and the facially inconclusive nature of the judgments of convictions that the government entered into the record below.

I do recognize that the government contends that, even if we were to excuse Mulkern's waiver below of any challenge to whether the submitted Shepard documents could establish, as a matter of law, that he had twice been convicted of "trafficking" cocaine, we still would confront a waiver on appeal. The government contends in this regard that Mulkern has waived on appeal any argument that he can show that the District Court plainly erred in relying on the Shepard documents that it "received" to conclude that the government had met its burden to show that he had been convicted of not just one but two prior "serious drug offense[s]" within the meaning of the ACCA. See Serrano-Mercado, 784 F.3d at 845. But, I cannot see how that is so.

Mulkern argued to us in his opening brief that he raised the Mathis-based argument below that he advances on appeal. Understandably, then, he did not in that brief address the plain error standard, as he was asserting that there had been no forfeiture at all. Moreover, after the government contended on appeal that Mulkern did not in fact raise the Mathis-based argument at his federal sentencing proceedings, he filed a reply brief in

which he argued both that there was no waiver of that argument and that there was at most only a forfeiture of it. He then further argued that, insofar as there was a forfeiture, he could meet the plain error standard.

So, when confronted with the contention that there was a forfeiture, Mulkern argued to us how he could overcome it. He did so by asserting that the District Court made a clear or obvious error in treating the Shepard documents that it had "received" as legally sufficient to show that he been twice convicted of "trafficking" cocaine; that such treatment prejudiced him by triggering the imposition of a mandatory and lengthy prison sentence; and that the error would "seriously impair[] the fairness, integrity, [and] public reputation of judicial proceedings." United States v. Rivera-Morales, 961 F.3d 1, 12 (1st Cir. 2020).

Moreover, I note that the government does not dispute that Mulkern has satisfied the prejudice prong of the plain error test. It contends only that he fails to meet the other prongs of that test. But, that contention is unpersuasive, given the perfect clarity of the legal error here and the evident injustice of permitting a defendant to be subject to a fifteen-year mandatory prison sentence due to such a clear legal error. I add only that, in holding the government to its own apparent view that, if there were a clear or obvious error, Mulkern was prejudiced by it, I am

hardly innovating.  See United States v. Paulino-Guzman, 807 F.3d 447, 450 n.5 (1st Cir. 2015) ("'[W]hen the government fails to request plain error review,' we may 'review the claim under the standard of review that is applied when the issue is properly preserved below.'" (citing United States v. Encarnación-Ruiz, 787 F.3d 581, 586 (1st Cir.2015))).

For these reasons, I cannot agree that our prior precedents in this realm preclude Mulkern from showing plain error here.  None of them involved, as this one does, a sentencing judge expressly identifying the specific documents that served as the evidentiary foundation for the application of the relevant sentencing enhancement when those documents patently provide no such foundation.  Nor are any of those cases ones in which the government failed to dispute the defendant's contention that he was prejudiced by being subjected to a sentencing enhancement on such a barren record.  Accordingly, those cases fail to show that we should not excuse the waiver that the majority contends occurred insofar as it means to suggest that the legal argument that Mulkern now asks us to consider is less than "highly convincing."

## C.

I recognize that even when a waived argument concerns a purely legal contention that is highly convincing, we must take account of any possible prejudice to the non-waiving party of our excusing the waiver.  But, in asserting that Mulkern is bound by

the mistaken legal position that he took below, the government does not suggest that Mulkern gained an edge by keeping additional evidence of his conduct hidden from the District Court at his federal sentencing. Nor does the government contend that there were other Shepard documents that were once available but that have since been lost to time. The government thus does not contend that Mulkern's failure to require the government to show its hand in the federal sentencing proceedings prejudiced its ability to make a strong showing that his two drug-related, Maine-law convictions were both for ACCA predicate offenses.

Rather, the government maintains on appeal that there are other Shepard documents from Mulkern's state court proceedings that were not entered into the record at his federal sentencing proceedings in the District Court, that it has those very documents in hand, and that it is prepared to reveal them now if asked. The government even notes that it would have shown them to the District Court if Mulkern had not agreed that the documents that it had entered into the record sufficed to show that he had been convicted twice of "trafficking" cocaine. How hard would it be, then, for the government to make those as-yet-unseen documents part of the record at this stage of the litigation, whether on appeal or in the District Court on remand, so that a court could then determine whether one of Mulkern's drug "trafficking" convictions in fact is for "trafficking" heroin?

In sum, the government is best positioned to know whether it would be prejudiced if we were to excuse the waiver.  Yet, it develops no argument as to how it would be prejudiced if we were to accept its own offer to have a court look at the mystery Shepard documents that it contends that it holds.  I thus cannot see any basis for concluding that our obligation to ensure that we treat the non-waiving party fairly requires that we refuse to consider Mulkern's meritorious legal contention under Mathis in deciding whether to affirm his federal sentence.

**D.**

I come, then, to the final prong of the test for determining whether to excuse the waiver.  That prong, like prong four of the plan error test, asks us to reflect on the relationship between a decision as to whether to excuse the waiver and confidence in the judicial system.  But, here, as well, I see more reason to excuse the waiver than not to do so.

The doctrines of waiver and forfeiture play an important role in ensuring an orderly process of appellate adjudication. See Orsini, 907 F.3d at 119.  But, they exist to facilitate, not thwart, the dispensing of justice.  See, e.g., United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011) (excusing a defendant's waiver of objection to his ACCA sentence enhancement because the plain error standard was met and there was "no threat . . . of unfair prejudice to the government").

The government has no legitimate interest in advocating for the imposition of a sentence pursuant to the ACCA if there are no Shepard documents that suffice to support the imposition of that sentence. And, the government has not explained how it would be prejudiced if we were to make it do what it has not yet done -- show a court evidence that could suffice to establish that Mulkern was convicted of two, rather than just one, "serious drug offense[s]" within the meaning of the ACCA. Thus, I do not think that it reflects well on our system of criminal justice to affirm the mandatory fifteen-year-long prison sentence in this case without first requiring a court to review the only evidence (if any there be) that could supply the missing record support for the imposition of that sentence.

We have been careful in our past cases to ensure that defendants facing sentencing enhancements based on convictions arising out of state criminal statutes that set forth divisible offenses are not incentivized to hold back contentions about deficiencies in the record to gain strategic advantage. Thus, when such defendants have led a sentencing judge to believe that there is extra-record evidence that would cinch the case for applying the relevant sentencing enhancement, we have been wary of permitting those defendants to reverse course on appeal by crying foul that no such evidence had been entered at sentencing.

Mulkern did not engage, however, in any such strategy. He staked his challenge to the imposition of the ACCA-based enhancement below on a mistaken legal contention about certain specific Shepard documents that had been submitted to the District Court. He now wishes to press the purely legal, and plainly correct, contention that he did not make at that time -- namely, the contention that those documents fail as a matter of law to show what they must. As that contention is clearly a winning one, I can see little justice in affirming a sentence that, as the record presently stands, provides no basis for concluding that it is a sentence that lawfully may be imposed on him.

### III.

For these reasons, I respectfully dissent from the majority's decision to affirm the sentence below, although I join fully in the rest of the majority's analysis.